MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS v. L. F. DAY.

No. 2162. Decided April 19, 1911.

**1.—Master and Servant—Negligence—Employing Improper Servant.**

Evidence considered and held sufficient to support the submission to the jury of the issue of negligence by a railway company in employing a servant of intemperate habits and violent disposition, the action being for injuries to another employee whom he had assaulted. The duties of the master with respect to care in the selection of fit servants and the evidence by which default in such duty may be shown reviewed. (Pp. 239-246.)

**2.—Same—Assault.**

The master may be held liable for negligence in the selection of an unfit servant—intemperate in habits and violent in disposition where injury in consequence thereof results from his assault on another employee in an altercation.

over the performance of the master's work, as well as in the case of injury by negligence of such unfit servant. (P. 246.)

**3.—Master and Servant—Vice-Principal.**

A "straw boss" of a railway bridge gang working in the presence and under the direction of the regular foreman and having no power to employ or discharge the other members nor authority over them at such time except to lead in the work and to communicate to them the directions received from the foreman was not a vice-principal as to such other members, within the meaning of article 4560f Revised Statutes, and the railway company was not responsible for an assault committed by him upon another of the workmen unless negligent in the employment of him when he was an unfit person therefor. (Pp. 246, 247.)

Questions certified from the Court of Civil Appeals, Fifth District, in an appeal from Ellis County.

*Coke, Miller & Coke* and *G. C. Groce,* for appellant.—Evidently the assault by Milam was a crime and was his individual, and personal act, and was not within the scope, apparent or real, of any authority from the common master, or in furtherance of the master's business and this is so clearly true that the trial court refused to submit any issue of liability dependant upon whether the assault was in furtherance of the common master's business. Gulf, C. & S. F. Ry. Co. v. Reed, 80 Texas, 362; Galveston, H. & S. A. Ry. Co. v. Currie, 100 Texas, 136.

In this case the issue submitted was whether appellant was negligent in the employment, and retention of Milam in its service. One is responsible in damages only for acts which in the exercise of ordinary care, he should foresee, and guard against, and in this case we submit that a fair and unprejudiced consideration of the evidence fails to show any negligence in the employment of Milam, or that during his employment in appellant's service, prior to the assault complained of, he had been of such habits and disposition as would reasonably have led a person of ordinary prudence, in the exercise of ordinary care, to have anticipated that he would be guilty of any such act as that made the basis of this suit, and the finding of the jury to the contrary is so entirely unsupported by the great preponderance of the testimony as to show it to be the result of prejudice.

*R. D. Thompson, C. E. Mead* and *Farrar, McRea & Kimble,* for appellee.—On sufficiency of the evidence of unfitness and negligence in employment: Railway Co. v. Johnson, 89 Texas, 522; Railway Co. v. Branch, 92 Texas, 288; Railway Co. v. Hays, 40 Texas Civ. App., 1621; Lawrence v. Railway Co., 25 Texas Civ. App., 293; Bonnet v. Railway Co., 89 Texas, 72; Railway Co. v. Branch, 29 Texas Civ. App., 144; Labatt, Mast. & Serv., sec. 189; 12 Am. & Eng. Enc. of Law, 909.

Under the pleading and evidence in this case, appellee was entitled to have the jury pass upon the issue as to whether Jim Milam, at the time he inflicted the injury upon him, was acting within the scope of his authority and in the furtherance of appellant's business, and it was error for the court to invade the province of the jury and decide this issue against appellee. Railway Co. v. Bowen, 36 Texas Civ. App., 165; Railway Co. v. Mother, 5 Texas Civ. App., 87; Railway Co. v. Taylor, 31 Texas Civ. App., 617; Railway Co. v. Bell, 73 S. W., 56; Railway

Co. v. Bell, 97 Texas, 71; Railway Co. v. Anderson, 82 Texas, 520; Railway Co. v. Parsons, 102 Texas, 157; Railway Co. v. Wheeler, 10 L. R. A. (N. S.), 1176;; Compher v. Telegraph Co., 106 S. W., 536; Railway Co. v. Cleveland, 100 S. W., 283; Fordyce v. Beecher, 2 Texas Civ. App., 24; Robards v. Bannon, 113 S. W., 429; Railway Co. v. Smith, 25 S. W., 1032.

MR. JUSTICE RAMSEY delivered the opinion of the court.

The certificate from the Court of Civil Appeals which presents the questions to which an answer in invited is quite lengthy, but can not, in justice to the case, be condensed by us. It is as follows:

"Appellee sued the appellant railway company to recover damages for personal injuries inflicted upon him about the 6th of August, 1907, by one Jim Milam, a servant of appellant. Both Milam and Day were members of the bridge gang, and it was alleged that Milam was assistant foreman and in authority over Day. A recovery was sought upon the ground that the railway company was negligent in employing Milam and retaining him in its service. A trial resulted in a judgment against the railway company in favor of Day, and the case is now pending before us on appeal.

"It was shown by practically uncontroverted evidence that in August, 1907, appellee, the witnesses Harrison, Bush, Turner, Diffie and Brown, with one Jim Milam and other parties, under the witness Irby as foreman, constituted a bridge and building gang in the services of appellant. Jim Milam was "Straw Boss" or "Scratch Boss" or assistant foreman. In the absence of the foreman he had supervision over and directed the gang. The foreman when present controlled the gang, but Milam was expected to lead in the work, and the foreman would tell him what he wanted done and he, Milam, would tell the men, and to this extent they were under him even when the foreman Irby was present. Milam had no authority to employ or discharge hands. The only authority he had in that regard, even in the absence of Irby, was to report men who did not do to suit him, and Irby discharged or not as he saw fit. On August 6, 1907, the gang was at work, at Circleville, in Williamson County, in loading on the cars the material of a water tank that had been torn down. Irby the foreman was with the gang. While engaged in this work Milam made an assault on Day with a knife, inflicting on him serious wounds. Concerning this assault and the circumstances attending it, the evidence is, in substance, as testified by appellee, viz.: "At the time of this injury I could not state positively just how much this tank had been loaded, but we were attempting to load the hoops, that is Mr. Irby gave an order to the boys to see if they could not get the hoops, but we found there was more material on them, and Jim Milam kept calling out to us to load the hoops, 'By God, come on.' Mr. Irby had given us another order but Jim kept calling on us to load the hoops, the hoops held the tank together but the other parts of the tank were wooden. . . . The best of my recollection is Milam said: 'Come on; go to the cars or come on.' We were confused by the orders. Mr. Irby had told us to do one thing and Mr. Milam was telling us to let them go. . . . We were hesitating on account of conflicting orders, and we were making

different remarks. I just says, 'We will have to get somebody to tell us what to do,' and I looked up and saw him (Jim Milam) running through the crowd with a knife and he says, 'I have stood enough, I have taken enough,' or something like that. I did not know who he was after, but I knew in a few minutes; he ran upon me cutting and slashing." There was evidence tending to show previous bad feeling between Milam and Day. Milam ran away immediately after the difficulty and there was evidence tending to show that he afterward committed suicide. The evidence on the issue of negligence of the company in the employment and retention of Milam in its service, and as to Milam's character is, in substance, as testified by the witnesses as follows. Appellee testified: "I became a member of Mr. Irby's bridge gang about the first of July, 1907, and continued to be a member of the gang until the 6th of August, following. Mr. Milam was a member of the gang all that time but he was hurt and out part of the time. Mr. Milam was quick tempered and quarrelsome, unpleasant. This was not the case the whole time I was with him. Some time he would get quarrelsome and some time he was a very pleasant man. At times he was tyrannical with the men employed under him. At times he was an unpleasant man. Milam drank intoxicants. He had been drunk. I had seen him drinking. When he would pass through a wet town he would usually get a bottle of whisky and I remember one time he ran the cook off; said the cook had stolen a bottle of whisky off of the ice. I did not see Milam what you would call drunk. The cook left the outfit. Our understanding was because he bawled him out about the whisky. I knew that Milam was a drinking man, some of the time he was all right and some of the time he was rough; he was rough and some of the time he drank. Milam was unpleasant and some of the time we might not be on the very best of terms, but they had hauled me out of Fort Wayne and I had to stay there. Some of the time we were not on the best of terms. I remember the night before the cutting he was sick and I gave him some medicine. Of course, on bridge work some feelings come up between all men. At times things were not very pleasant between Milam and me but nothing serious. While we were not the very best of friends, at the same time I had nothing against him. I can not say that before Milam and I had disagreed any more than the others. I didn't admire Milam. I don't know how well I let him know that. When he started after me with his knife he said something about he had taken enough, something like that."

"J. R. Bush, witness for plaintiff, testified as follows: 'I had been working with the bridge crew at the time of the cutting continuously since the 10th or 12th of July, 1907. I do not know how long Jim Milam had been working for the Missouri, Kansas and Texas Railway Company of Texas, but he was working for them when I commenced on the date last above mentioned. I was with Jim Milam all the time during working hours from about July 10 to August 6, 1907, and had every opportunity to become well acquainted with Milam as is possible in that length of time. I knew Milam's habits as to whether or not he was sober or a drinking man. I knew his disposition as to whether he was a quiet and peaceable and well disposed man or whether

or not he was high and quick tempered. He was what is called a drinking man and was not a quiet, peaceable and well disposed man. He had a high and quick temper when drinking and after being drunk. Jim Milam drank to excess whenever he could get whisky and he usually kept whisky on hand. He drank whisky. He drank at all times, both on and off duty. Can't say he drank any more on Sundays than on other days for he drank all that he could get at all times. There was a difference in his disposition towards the members of the crew when he was sober and when he was drinking, except after he had been drunk he was about the same as when he was drunk. When he was drinking or just after a drinking spell he was awful overbearing and hard to get along with. I knew the general reputation of Jim Milam among the members of the bridge crew for sobriety or the excessive use of intoxicants; his reputation was that of getting drunk and being addicted to the drinking habit to excess and that he was not a sober man. I know his general reputation at said time among said persons as to being a peaceable and orderly person and as to being quarrelsome, overbearing and tyrannical in his disposition. He had the reputation of being a quarrelsome, overbearing and tyrannical man and boss and his reputation was that he was not a peaceable and orderly person. I know the general reputation of Milam at said time among said persons as to his being competent, safe or suitable person to be placed in charge of or to be associated with other employees or in charge of them in their work.' On cross-examination this witness testified: 'I had been a member of the gang since about July 10, 1907, and remained a member of same six or eight days after the difficulty. I quit the service at Temple and have resided since said time about six miles southwest of Commerce, Hunt County, Texas, where I now reside. . . . I do not know of Jim Milam having a personal difficulty with any one except L. F. Day. He had various rackets, fusses and quarrels but this is the only fight I knew of his having. It is not a fact that Milam was or was usually considered to be an ordinary, peaceable, well disposed and agreeable fellow. . . . He, Milam, was having some words with some member of the crew all the time. He talked in an overbearing and quarrelsome manner to some of them all the time and by some of them I mean those to whom his remarks were directed at the time, for he talked to all of them in that manner, but it would be to some of them at a time. However, there was one member of the crew that I never heard him talk in that manner to but once and that was Max Brown. On Saturday before the difficulty on Monday he directed different members to go upon a scaffold and each of them refused because it was not safe; he then directed Max to go upon it and he refused, giving as his reason that it was not braced properly. Milam was intoxicated on duty so many times it is hard to give the dates or places, for it was so often that I got used to it and did not take special notice of it. He was drunk on the Saturday before the difficulty at the time and place above mentioned. He was drunk on duty at Lorena about ten or twelve days before the difficulty. He was drunk at Temple about a week prior to the difficulty. I can't say that he was drunk when he assaulted Day, but he had been drunk

for the two days before. On the morning of the difficulty he had made several trips to the car and when he would come back I could smell whisky on his breath. He was drunk Saturday and Sunday and was drinking Monday morning at the time of the difficulty. I was a member of the same bridge crew with Jim Milam from July 10 to August 6, 1907. We worked on defendant's railroad between Waco and Elgin. I can't give the members of the bridge crew during the time. They were changing all the time and I do not remember all of them. Joe Perkins, Frank Turner, Max Brown, ——— Costilla, and practically all other members of the crew, whose names I can't recall. I have discussed the reputation of Milam, of his crabbedness and drunkenness, which brought on the discussion. All of above named parties discussed the habits and disposition of Milam at many different times and places, one of which was at Granger about two weeks prior to the difficulty. It was common talk and discussed so often that I could say each member of the crew discussed his habits and disposition at every point the crew was during my service prior to the difficulty. I do not know of Milam having a difficulty with any other member of the bridge crew than Day, at the time of this difficulty, in which he engaged in a fight or inflicted any violence.'

"Harrison, Turner, Brown and Diffie, witnesses for appellant, testified, in effect, that they had associated with Milam during the time he had been with the gang. That he would drink intoxicants, but never saw him intoxicated while on duty, and he seemed to be a sociable, nice, quiet fellow and friendly with everybody and did not consider him of a quarrelsome and turbulent disposition; never knew of his having any difficulty with any one except the one with Day.

"W. S. Irby, for appellant, testified: 'I knew Jim Milam from the 17th of June to the 16th of August—6th of August, I mean. I never saw anything out of the ordinary in Jim Milam. To my knowledge during the time I knew him he had not been engaged in any personal difficulty with any one up to the time of this trouble with Mr. Day. If Mr. Milam ever drank I didn't know it. Never to my knowledge was he intoxicated on duty. I never knew anything out of the ordinary about Milam's disposition. He was always pleasant and agreeable so far as I ever saw him. I knew there was an estrangement between them. I had a worthless negro cooking there; he was no account, I ran him off. I ain't clear on that.' On cross-examination the witness says: 'The company don't want drunk men, no sir. They don't want men who are in the habit of getting drunk. They don't want men who are quarrelsome, broilers and who cause trouble. If I hired that kind of men and the company found it out they would likely call for an explanation. I never heard of Milam being drunk. I won't say I never heard of him drinking any. He may have taken a drink, I don't know. Some days before this my gang got some material some place to build some scaffolding. I don't recall just now where we do get the material. We may have got it at Temple. I could not tell you whether we were in Temple about the first of August or not, without my book here to look it up. I don't think Milam could have been drunk on duty and I not have known it. I don't recall anything about Milam being drunk at Temple. I won't say that he didn't get drunk;

but I will say he never got drunk on duty around the outfit while he was working for me. I will say that much.' On re-direct examination the witness testified: 'If Milam ever talked to members of the gang in an overbearing and quarrelsome way I never heard it. If Milam was drunk on Saturday before this difficulty I didn't know it. If Milam was drunk at Lorena 10 or 12 days before this difficulty I didn't know it. He was not drunk at Temple a week prior to the difficulty that I know of. He was not drunk Saturday and Sunday before the difficulty that I know of. If he was drinking on the day of the difficulty I didn't know it. The only authority Milam would have when I wasn't there was if the men didn't do to suit him he was to tell me, report it to me. When I was absent he could only have stopped the man from working and waited until I came and then if I had seen fit to have discharged him I would have done so, otherwise I would not. If Milam had been drunk and raising any disturbance I should have discharged him. If he had even been drunk on duty I would have discharged him, without his raising any disturbance.'"

"There was no evidence that appellant did or did not make an investigation of Milam's character and fitness before employing him.

"Question 1. Under the foregoing evidence was the jury justified in finding that appellant was negligent in employing and retaining Milam in its service, and if so, was the negligence such as to make appellant liable to Day for the injuries inflicted by Milam?

"Question 2. Was the position of Milam, that of 'straw boss,' as stated, such as to render the appellant liable for the act of Milam in injuring Day under the circumstances stated?"

"The members of this court are divided in opinion on these issues and think it proper to certify the foregoing questions for Your Honors' answers."

1. Both of these questions involve the decision of questions of fact and the sufficiency of the evidence to sustain a recovery. To the extent that they do involve conclusions on the facts stated we have deemed it no part of our office or duty to answer. We shall, however, undertake to answer both questions in so far as they involve questions of law and with such definiteness and fullness as should enable the Court of Civil Appeals to apply the law so declared, to the facts stated.

We think it can not be doubted, under the authorities, that there was evidence tending to show and which, if credited, would have justified the conclusion that appellant was negligent in employing and in retaining Milam in its service and that by such negligence appellee was subjected to the peril and danger of injury by him.

It is stated by the Court of Civil Appeals that "there was no evidence that appellant did or did not make an investigation of Milam's character and fitness before employing him." Since this was a fact peculiarly within the knowledge of the railway company, its failure to produce such evidence, when if inquiry had been made the proof was not only readily accessible, but of value to it, might well justify the jury in concluding that no such inquiry had been made. It is well settled in this State that it is the duty of a railway company to use ordinary and reasonable care to inform itself of the character and efficiency of its servants. Texas & P. Ry. Co. v. Johnson, 89 Texas,

519; Labatt on Master & Servant, sec. 194. And if not alone, certainly in connection with other proof, the failure to make such inquiry may well justify a finding of negligence.

Again it is well settled that proof of general bad reputation may suffice to visit the master with notice of the unfitness of his servant, although there may, in fact, be no actual knowledge thereof proven. This rule is not only supported by the authorities but is supported by reason and sound public policy. In the case last cited it is said, quoting from McKinney on Fellow Servants: Evidence of general reputation is admissible to prove the unfitness of a fellow servant, and ignorance of such general reputation on the part of the master is itself negligence, in a case in which proper inquiry would have obtained the necessary information and where the duty to inquire was plainly imperative. Under the testimony of Rush, Milam's bad reputation existed among his associates for the whole period of his employment and while this time was short and the circle of his acquaintance limited, we think in view of all the facts and especially the extent to which Irby, the foreman, was thrown with all these men, that it was sufficient to raise the issue of unfitness.

It is said by Labatt in his valuable work on Master & Servant, vol. 1, page 432. "Under either of these doctrines, evidence of reputation is only admitted when the injury in suit was due to the particular kind of unfitness for which the servant was notorious, and when the unfitness is of such a kind that it may become the subject of a general reputation." It has been held, however, that reputation for intemperance comes within the rule of general reputation. In the well considered case of Norfolk & Western R. Co. v. Hoover, 25 L. R. A., 710, 79 Md., 253, 47 Am. St., 342, the Maryland Court of Appeals said:

"It has been repeatedly held by this court, and is the settled and established doctrine of Maryland, that in actions of this character, where a servant sues his master for injuries resulting from the negligence of a fellow servant, the plaintiff, to succeed, must prove not only that some negligence of the fellow servant caused the injury, but also that the master had himself been guilty of negligence, either in the selection of the negligent fellow servant in the first instance, or in retaining him in his service afterwards. Mere negligence on the part of a fellow servant, though resulting in injury, will not suffice to support the action because the master does not insure one employee against the carelessness of another; but he owes to each of his servants the duty of using reasonable care and caution in the selection of competent fellow servants, and in the retention in his service of none but those who are. If he does not perform this duty, and an injury is occasioned by the negligence of an incompetent or careless servant, the master is responsible to the injured employee, not for the mere negligent act or omission of the incompetent or careless servant, but for his own negligence in not discharging his own duty towards the injured servant. As this negligence of the master must be proved, it may be proved like any other fact, either by direct evidence, or by the proof of circumstances from which its existence may, as a conclusion of fact, be fairly and reasonably inferred. That drunkenness on the part of a railroad employee renders him an incompetent servant will scarcely

be disputed; nor can it be questioned that a master who knowingly employs such a servant, or who, knowing his habits, retains him in his service, would be guilty of a reckless and wanton breach of duty, not only to the public, but to every employee in his service. There is no evidence in the record nor has there been a suggestion, that either the conductor, fireman, or flagman of the train was negligent or incompetent. The negligence which directly caused the accident is attributed solely to the brakeman; and the appellant's negligence, which, as it is claimed, fixes its liability, lies in its employment of, or continuing to retain in its service, these dissipated or intemperate brakemen. But, as we have stated, it was necessary for the plaintiff to show, not only their employment, but that the company had not used due and ordinary care in selecting them. There was no direct evidence adduced to show the absence of such care; but the question excepted to, and the evidence elicited in response to it, were designed to show by indirect or circumstantial evidence that the company had not used the degree of care and caution in the selection of these brakemen that its duty imperatively required it to use. So the question is, Can you fix upon the master a failure to use due care in selecting careful servants by showing such notorious or general reputation respecting the servant's unfitness or incompetency as that the master could not, without negligence on his part, have been ignorant of it when he employed the servant? About this there ought to be no difficulty. If the servant's general reputation before employment is so notorious as to unfitness as that it must have been known to the master but for his (the master's) negligence in not informing himself. If he could have been ignorant of it only because he failed to make investigation, then it is obvious that he had not used the care and caution which the law demands of him in selecting his employees. Hence, 'the servant's general reputation for unfitness may be sufficient to overcome the presumption that the master used due care in his selection, even though actual knowledge of such reputation for unfitness on the master's part is not shown.' Wood, Master & Servant, sec. 420.

"In Davis v. Detroit & M. R. Co., 20 Mich., 112, 4 Am. Rep., 364, Cooley, J., speaking for the court, adopts the case of Gilman v. Eastern R. Co., 13 Allen, 433, 90 Am. Dec., 210, which puts upon the employer the responsibility of negligently employing an unfit person, genenally known and reputed to be such, notwithstanding the employer may in fact have been ignorant of such unfitness. Continuing, he said: 'The ignorance itself is negligence in a case in which any proper inquiry would have obtained the necessary information, and where the duty to inquire was plainly imperative.' So in Hilts v. Chicago & G. T. R. Co., 55 Mich., 437, where a track hand was killed by an engine backing rapidly along a switch, and the engineman was drunk, the court said: 'When, however, as in this case, it is shown that the accident occurred through the negligent act of the servant, who was in an intoxicated condition, and when it is shown, further, that he was in the habit of drinking intoxicating liquors to excess, and such habit had extended over a period of nine months while in the defendant's employ, and no actual knowledge or notice ever reached any superior officer of the engineer, we think the jury may be justified in conclud-

ing from such evidence that the defendant was negligent in failing to learn such habit, and in retaining the engineer in its employment.' See also, Gilman v. Eastern R. Co., 90 Am. Dec., 210, 13 Allen, 433; Wright v. New York Cent. R. Co., 25 N. Y., 566; Chicago & A. R. Co. v. Sullivan, 63 Ill., 293; Chapman v. Erie R. Co., 55 N. Y., 579. The evidence offered and admitted had no relation to specific or isolated acts of negligence. These, unless brought home to the knowledge of the master, would not have been admissible as reflecting on the question of the master's care. Baltimore Elevator Co. v. Neal, 65 Md., 438."

And we think there could be no difference whether the injury result from negligence in doing the master's work or from an assault made by a dangerous, drunken and desperate employee if his reputation was such that the master might reasonably have foreseen such consequences.

Again, it has sometimes been held that the act causing the injury may itself be of such character as to warrant the jury in finding that the master had retained the servant with knowledge of his incompetency. Mr. Labatt says, vol. 1, p. 429, "It seems impossible to deny that the delinquency which caused the injury may be of such a flagrant character that a jury might fairly infer that the master could not have failed to discover the servant's unfitness if proper inquiries had been instituted when he was hired or his work had been properly supervised." This rule it must be evident must ordinarily have relation to those acts of unskillfulness and obvious incapacity which would develop in the course of the servant's labor in carrying on the master's business. But we think by analogy that in the fact of an assault both so desperate and so unprovoked the jury might find some support of the charge of the unfitness of Milam and of appellant's negligence in not discovering it. In what we have said we have not undertaken to determine the weight and probative force of the testimony. We merely hold that on the issue made, covered by the first question submitted, there was sufficient evidence to carry the case to the jury.

2. To the second question we answer that the position of Milam was not, as applied to the facts of this case, such as to render the appellant liable for his acts on the theory that he was a vice-principal.

Article 4560f of Batts' Civil Statutes is as follows: "All persons engaged in the service of any person, receiver or corporation, controlling or operating a railroad or street railway the line of which shall be situated in whole or in part in this State, who are intrusted by such person, receiver, or corporation with the authority of superintendence, control or command of other servants or employees of such person, receiver, or corporation, or with the authority to direct any other employee in the performance of any duty of such employee, are vice-principals of such person, receiver, or corporation, and are not fellow servants with their coemployees."

To correctly apply this statute we must keep in mind the facts of the case. The certificate states: "Jim Milam was 'straw boss,' or 'scratch boss,' or assistant foreman. In the absence of the foreman he had supervision over and directed the gang. The foreman, when present, controlled the gang, but Milam was expected to lead in the work,

and the foreman would tell him what he wanted done and he, Milam, would tell the men, and to this extent they were under him even when the foreman Irby was present. Milam had no authority to employ or discharge hands." It appears from the testimony that Irby, the foreman, was present in active and actual control of the men and the work when appellee was hurt. A question quite similar to this, under a statute substantially identical with the article above quoted, was before this court in the case of Texas Central Ry. Co. v. Frazier, 90 Texas, 33. In that case it was in evidence that it was the duty of the engineer to give signals which when so given were to be obeyed by brakemen. Since Frazier, a brakeman, occupied this relation to the engineer, it was contended that this was such superintendence, control and command of the engineer over Frazier as made him, under the then existing law, a vice-principal. This position and contention was, however, squarely denied by this court. In discussing the question, Judge Denman said:

"The purpose of the statute was to impute to the master the negligence of an employee upon whom he has conferred authority or power to influence the action or volition of another employee in the performance of his duties. Under the common law rule, as settled in this State before the statute, the negligence of an employee would not have been imputed to the master unless he had the power to employ and discharge, it being assumed that such power was necessary to subject the will of the latter to that of the former.

"The statute, however, is based upon the theory that the authority or power in one employee to superintend, control, or command, or direct another employee in the performance of his duties, as effectually influences and subjects to the former the will of the latter as does the power to employ and discharge. But it was not the purpose of the statute to impute to the master the negligence of an employee upon whom he had conferred no such power, but had merely imposed the duty, in certain contingencies arising in the course of his employment, of giving a signal whereby another employee would know that the occasion had arisen for him to perform some duty imposed upon him by the rules governing his employment, leaving such employee free to perform such duty in his own way under such rules. In such a case there is no subjection of the will of one to that of the other."

The rule there laid down and the principle therein announced seems conclusive of this case.