## OIL BELT POWER CO. v. TOUCHSTONE.
### (No. 10731.)

(Court of Civil Appeals of Texas. Fort Worth. June 14, 1924. Motion for Rehearing Dismissed Oct. 25, 1924.)

**1. Electricity ⬳16(2)—Maintaining uninsulated wire without warning where persons may reasonably be expected to come is negligence.**

It is negligence to maintain uninsulated wire highly charged with electricity, without, warning, in place where persons may reasonably be expected to come in contact therewith.

**2. Electricity ⬳16(2)—Test of liability for injuries from uninsulated wires stated.**

If company maintaining uninsulated electric wires, a few feet above another's water tank, without posting warnings, might reasonably have anticipated that some one would go on running board of tank, under circumstances similar to those under which deceased went thereon, and might probably sustain injury, it was liable for the injury.

**3. Electricity ⬳19(5)—Evidence held sufficient to sustain finding injury might have been anticipated.**

In action for death from electricity, while on runway preparatory to diving into water tank over which defendant maintained uninsulated wires without warning, evidence *held* sufficient to sustain finding that defendant might have anticipated injury to person similarly situated.

**4. Electricity ⬳15(1)—Owner of wire near water tank not excused from liability because person killed had been swimming in tank.**

In action for death from electric wire over water tank, where evidence was sufficient, prima facie, to show that deceased would have been killed if he had not been swimming, fact that he had been swimming in water tank did not excuse owner of wire from liability as matter of law.

**5. Electricity ⬳15(1)—Fact that deceased, given permission to go on water tank for special purpose, went swimming, no defense to owner of wire.**

Fact that person killed by electricity was given permission to go on runway over water tank to look for cattle, and went in swimming in tank, *held* no defense to owner of uninsulated electric wire near the runway which caused death.

**6. Electricity ⬳19(12)—Evidence held not to conclusively show contributory negligence of person killed.**

Where deceased had little opportunity to know of danger of uninsulated electric wires near runway of water tank, and no warnings had been posted, contributory negligence by him in going on runway to dive into tank *held* not conclusively established.

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**7. Electricity ⊕19(5)—Proof defendant owned and maintained wires causing death held sufficient.**

In action for death from electricity, testimony *held* sufficient, prima facie, as to ownership and maintenance of wires by defendant in absence of testimony to contrary, fact of ownership and maintenance of line being peculiarly within its own knowledge.

**8. Electricity ⊕19(13)—Court's use of term "concealed danger" with reference to current in wires not error.**

In action for death from electricity, court's use of term "concealed danger," with reference to current in uninsulated wires, was not error.

**9. Trial ⊕121(2)—Argument of counsel on theory that death from electricity was caused by coming near wire not reversible error.**

Where witness testified to seeing electricity run down body of deceased, and did not undertake to say whether deceased touched wire, argument of counsel based on theory that death was caused from coming near uninsulated wire and not into contact therewith was not reversible error.

**10. Trial ⊕120(2)—Mistaken argument of counsel as to statement of witness held not reversible error.**

In action for death from electricity, where witness testified to having seen men swimming in water tank where death occurred, statement of counsel in argument that she had seen them year after year was not reversible error.

**11. Death ⊕99(3)—$10,000 for death of 16 year old boy held not excessive.**

Verdict of $10,000 for death of 16 year old boy, sole support of mother and family, was not so excessive as to require reversal.

**12. Death ⊕87—Parent may recover for financial benefits reasonably expected from child after majority.**

Parent has right to recover for death of minor child for financial benefits reasonably expected after child reaches majority.

Appeal from District Court, Stephens County; C. O. Hamlin, Judge.

Action by Mrs. Ulla Touchstone against the Oil Belt Power Company and others. From judgment for plaintiff as against named defendant, it appeals. Affirmed.

Templeton, Beall, Williams & Worsham, of Dallas, J. L. Goggans, of Breckenridge, and Scott, Brelsford, Funderburk & Ferrell, of Eastland, for appellant.

DUNKLIN, J. Mrs. Ulla Touchstone recovered a judgment against the Oil Belt Power Company as damages resulting from the death of her minor son, Webbie Touchstone, from which the Oil Belt Power Company has prosecuted this appeal.

The Oil Cities Electric Company, F. M. Gill, and J. W. Maddox were also made defendants in the case, but a judgment was rendered in their favor, and of that judgment no complaint has been made.

The Gulf Production Company maintained, upon land which had been leased by it for oil and gas, a wooden water tank of 1,600 barrels capacity, about 16 feet high, and between 12 and 15 feet in diameter. Across the top of the tank there was a plank 6 inches wide and 2 inches thick, each end resting on the outer edge of the tank, and was supported by an upright stay which rested on the bottom of the tank. The plank was called by witnesses a "runway." Attached to the tank was a ladder provided to enable persons to go to the top of the tank and upon the plank extending across it. The top end of this ladder rested against the top edge of the tank, and was in a slanting position, the bottom end resting on the ground a few feet from the bottom of the tank. The tank was on an oil lease owned by the Gulf Production Company, and was used by that company as a supply tank for the storage of water to be used in steam boilers operated on the lease. Three electric wires extended overhead directly across the top of the tank, two of which were each a small fraction over 7 feet above the top of the tank, and the other approximately one foot higher. Those wires were uninsulated, and there was testimony sufficient to support a finding that they were owned and maintained by the appellant Oil Belt Power Company. The evidence further showed that the water tank had been erected and had been in use for about three years before the electric wires were strung above it. There was also testimony sufficient to show that no warnings were posted on the water tank or near it of the danger of coming in contact with those electric wires. The wires were supported by posts erected for that purpose, one of which was 15 or 20 feet east of the tank, and the other about the same distance west.

Plaintiff's son, Webbie Touchstone, went in swimming in the water tank mentioned above, and the evidence was sufficient to show that while so engaged he was killed by an electric current passing from one of appellant's wires extending across and above the tank. Farrell Bishop, one of his companions, testified as follows as to how the accident occurred:

"I knew Webbie Touchstone during his lifetime, and remember the occasion when he was electrocuted and killed at the water tank. I was working with Webbie Touchstone at the time. In July, 1922, Webbie Touchstone was running a dairy there for his mother. I remember when we all went to the water tank that day. Iver Holt and Webbie Touchstone and his two cousins from Houston were with me that day. Their names were W. I. Ives and Oran Sholar I think they live in South Texas. but they are not here now. I was at the water tank at the time Webbie Touchstone was killed. and at that time was sitting on the side of the

tank watching him. Three of us boys, myself, Iver Holt, and Webbie Touchstone crawled upon this board that went across the tank to dive off. I was fixing to, but he got up there before I did, and he walked out to about the middle of the tank and started to dive off. I suppose he must have got overbalanced and reached up his hands that way (indicating) and the electricity struck him. I did not see the electricity jump from the wires to his hands, but I saw it run down his body and out of his heels, and then he fell over into the tank and I jumped in after him and after I got him to the top of the water I hollered for Iver Holt and he came out and helped me get him to the side of the tank. We got him out of the tank. He was dead before we got him to the side of the tank.

"I saw Webbie Touchstone just before he fell in the water and saw him when he threw up his hands. I think the supports that hold up the plank that run across the tank were rather old and rotten; they were not very substantial. I could not be sure that they began to sway from one side to the other when he walked out, but if it was not that he just kind of lost his balance and threw up both his hands. You ask if I was looking at any certain place on his body. I saw the electricity run down his body. I guess that platform was about six inches wide. Webbie had been in the water before he got up on the plank and I suppose he was dripping wet with water, if he had been in the water. I don't know whether the plank was wet or not, I could not be sure. I never noticed the plank very close. It was wet at his feet where he stopped. I could not say for sure how tall Webbie Touchstone was, but he must have been about 5 feet nine or ten inches. He was not quite as tall as I was. (Witness stands up and raises his hands at request of counsel) I think I am about three inches taller now than he was then. I am about six feet tall now, and I would say he was about five feet nine inches. He was 16 years old. He was a good swimmer. I am not related to him. This plank was about three feet above the water in the tank. I was in swimming there about five minutes before this accident happened. Webbie and his two cousins, W. I. and Oran, got to the tank first. Those were the two boys that did not go in swimming. Webbie had his clothes off and in the tank before I got there. His clothes were laying on the ground by the side of the tank. I did not see him pull off his clothes. When the accident happened Webbie was entirely undressed and had just got up on this board out of the water.

"There was a ladder there attached to the tank on which we went up on the tank, and a gang plank across the tank, and that is the plank Webbie was standing on when I saw this electricity shoot down him. One edge of that gang plank was nearer the edge with the ladder than the other end. I am not sure how far the nearest part of the plank was to the ladder, but it must have been about three feet. These wires run across about the center of the tank, and the tank was fifteen or sixteen feet wide, something like that."

Plaintiff, Mrs. Ulla Touchstone, testified as follows:

"I live about a mile east of Breckenridge, and in July of last year I was living on the Jessie R. Smith lease about three miles south of town. I was married, but on or about the 31st of July, 1922, I was not living with my husband, and did not know where he was. It had been about 12 days since he had abandoned me, and I have not lived with him since that time. I don't know at the present time where he is. I had four children. Webbie was 16 and Electra, a girl, was 13, Zenda, a boy, 11, and Georgiana, a girl, 6. After my husband abandoned me and my family I just had Webbie to care for me and support me; he did that.

"You ask me if I remember where the water tank on the Smith tract of land is located. I think it is on the north part of the lease. That tank belonged to the Gulf Production Company. There was pasture around there. That tank must have been built there about 3 years ago, maybe later, I don't remember the exact time. I remember when the wires of the Oil Belt Power Company were built along there, sometime about 1921. The tank was built before the wires of the Oil Belt Power Company were placed there. I had been living around in that vicinity for some time. When they built the tank they put a ladder on it for the purpose of going to the top of the tank. That ladder was attached to the tank at the top. My brother, R. C. Wills, was the farm boss of the Gulf Production Company at that time. I have seen the boards or gang planks across the tank, they were there at that time and were made of two by six, about six inches wide. This ladder and tank and boards had been there ever since the tank was erected. That ladder was used for the pumpers to get up on and see about the water and drive hoops and such things as that. The gang planks were up there for people to cross backwards and forwards on.

"After my husband abandoned me, Webbie was looking after the dairy for me. R. C. Wills, the farm boss of the lease, was my brother. He had charge of the properties of the Gulf people on that lease. I had a conversation with Mr. Wills some three or four days prior to the day Webbie was killed. On the day Webbie was killed, about one or two o'clock that day, I heard a conversation between Mr. Wills and Webbie Touchstone with reference to the use of the tank. Mr. Wills came by my place about 1 or 1:30, just after we had dinner, and talked to me. He was in a hurry because he was working. After Mr. Touchstone went away he felt he wanted to help us out, he was the older and I looked to him for advice. He advised me and Webbie both, Webbie was young and had everything in charge. He told Webbie to go up on the water tank and look for the cows, he wanted to sell some dry cows that had been standing around the tank and made it muddy for the pumpers, he said it was a little further to go up on the tank and look for the cows, but would save time. He had got a man out from town to see the cows, a purchaser of the cows. That is why he went on the tank. After this conversation Webbie went straight to the tank, I suppose. I never saw Webbie any more alive after this time. The next time I saw him was when he was lying down by the side of the tank. Iran, I believe, came and notified me that Webbie had been killed. I don't know just how long it was after Mr. Wills had directed him to go up there until I saw him lying there at the tank dead, because I was too hurt, I don't remember. * * *

"During the time that I lived in that vicinity I had occasion to be around that tank frequently. The children and I went there often to look for the cows around there. They would sometimes go up there to drink, as there was water there. I passed on the road lots of times and could always see the tank from the road. I have seen people on the tank lots of times; I have seen the pipe line men, I think they were, in the tank swimming, from the road passing. I can't say exactly how long the tank has been there, but I am sure it has been over three years, maybe a little longer. I have seen people, during that time, on there lots of times. * * * I suppose that plank on the top of the tank runs clear across. You can't see the plank from the ground, but have to climb the ladder. I have been up on the ladder both before and after the accident. I was on the ladder twice before the accident. Webbie was with me once. I suppose he was with me both times; but he may not have been right at the ladder, but the other children were. That must have been over a year before the accident, the first time, but can't tell how long before the accident I was there the second time, but since then, though Webbie was in the habit of going in swimming, but can't say as to that tank. I would not know and don't know whether he was ever in swimming in the tank before the time he was killed. I am not positive whether the power line was there the first time I was up on the tank, but the second time it was. * * *

"There were no posters or danger signs of any kind around the tank or poles there. You ask me to describe the appearance of the wires. Well, there were just three wires, I don't know, but they looked like about a foot or a foot and a half apart, looked like common ordinary wire, telephone or anything. You ask if they were hanging tight or loose or how. Well, the middle wire sagged. It looked like it might sag, just looking at it from the ground, but of course I could not say about how much it appeared to sag. As to Webbie's experience around electricity and electric wires and things of that kind, if he was ever around any kind of electricity, I never knew it. He had been at home and around me all the time, and never spent but very few nights out of my house in his life."

There was other testimony tending to show that timber growing around and near the water tank obstructed the view of the country in that immediate vicinity, and that while standing on top of the tank Webbie Touchstone was in a better position to see the cattle for which he was sent to look than while on the ground. The testimony referred to above was all introduced by plaintiff, after the introduction of which she rested her case. Thereupon the defendants rested their case also, without the introduction of any evidence whatsoever.

The trial judge gave a peremptory instruction in favor of defendants Oil Cities Electric Company, M. F. Gill, and J. W Maddox, but submitted to the jury the issue of alleged negligence of the defendant Oil Belt Power Company in maintaining wires carrying a deadly amount of electricity across and over the water tank, and in the manner and in the location where the same were maintained, and also the issue of alleged negligence of said defendant in failing to post notices, giving warning of the danger to persons coming in contact with or near said wires, and in that connection instructed the jury that upon a finding of negligence in either of those respects a verdict should be returned in favor of the plaintiff, in the absence of any finding of contributory negligence on the part of Webbie Touchstone. The court also submitted to the jury issues of contributory negligence on the part of the deceased, coupled with the instruction that a finding of contributory negligence on his part would preclude a recovery by plaintiff. The court further instructed the jury that they would return a verdict in favor of appellant if they believed that the death of Webbie Touchstone was the result of an accident which could not have been reasonably anticipated either by him or by defendant. Appellant's request for an instructed verdict in its favor was refused. The case was submitted to the jury on a general charge and not upon special issues, and the verdict returned in favor of the plaintiff against the appellant was a general verdict in the aggregate sum of $10,000 as damages, $1 of which was apportioned to W. W. Touchstone, plaintiff's husband who, according to her pleading and evidence, had abandoned her.

Appellant insists that the evidence fails to disclose any facts sufficient to charge it with knowledge of the use or contemplated use of the tank for swimming purposes; that it also fails to show any other right of the deceased to use the tank than the permission given him by the superintendent of the oil company owning the same to go upon it for the purpose of looking for cattle; that it also fails to show any knowledge on the part of appellant of the giving of such permission; and that therefore there was an absence of evidence sufficient to charge appellant with the duty of foreseeing the probable presence of deceased upon the tank and the consequent danger to which he was exposed when killed. It is further insisted that any duty which appellant owed to foresee danger to employees of the owner of the water tank, while going upon the running board to clean out the same, did not include the duty to foresee the probable presence and consequent injury to plaintiff's son, who was not such an employee, and was not present upon the tank in discharge of any duty to its owner. For those reasons appellant insists that the trial court should have instructed a verdict in its favor.

In the case of City of Greenville v Pitts, 102 Tex. 1, 107 S. W. 50, 14 L. R. A. (N. S.) 979, 132 Am. St. Rep. 843, it appeared that Pitts, who was a police officer, went upon the top of a building for the purpose of detecting unlawful gambling going on in an ad-

joining house, and while there came in contact with an electric wire maintained by the city and not properly insulated, and as a result thereof sustained injuries. There was no means of access to the roof provided, and he reached it by climbing over adjoining buildings. Our Supreme Court held that the city owed him no duty to insulate the wires for his protection under the circumstances, and that he could not recover. The following was said in the opinion in that case:

"The city, it appears, maintained its wire partly upon the wall of buildings belonging to others and partly in the space above such wall. This was the affair of the city and the owners of the property. We must assume that the wire was there lawfully  As to the plaintiff, having no right with respect to such wall and such space, they are to be regarded as the premises, not only of the owner of the lot and the buildings, but of the city. Neither was under legal duty to keep them safe for the plaintiff. If the roof had fallen in with plaintiff, would any one contend that the owner would be liable to him? In what does the attitude of the city differ? It was not keeping its wire in a public place, where all had the right to go, or might be expected to go, but on private premises, which we must presume it had acquired some right or permission so to use, and was under no duty, in keeping its property there, to one like plaintiff, who went there without invitation or inducement from anyone interested in such premises. Dobbins v. Missouri, K. & T. Railway Co., 91 Tex. 62."

In the case of Dobbins v. M., K. & T. Ry. Co., 91 Tex. 60, 41 S. W. 62, 38 L. R. A. 573, 66 Am. St. Rep. 856, cited in the opinion above, it was held that there could be no recovery for the death of a three year old child, who was drowned in a pool of water on the company's right of way. It appeared that the parents of the child lived in a section house situated on the right of way, and that the child wandered from the house without the knowledge of the parents, and a short time thereafter was found drowned in the pool. It further appeared that there was a pathway leading across the right'of way near the pool. In that case the following was said:

"The common law imposes no duty upon the owner to use care to keep his property in such condition that persons going thereon without his invitation may not be injured. In considering the question as to whether a duty exists there is no distinction between a case where an infant is injured and one where the injury is to an adult, though where the duty is imposed the law may exact more vigilance in its discharge as to the former. If there be no duty the question of negligence is not reached, for negligence can in law only be predicated upon a failure to use the degree of care required of one by law in the discharge of a duty imposed thereby."

The court then proceeded to criticize the doctrine of the "turntable cases" (Bransom's Adm'r v. Labrot, 81 Ky. 638, 50 Am. Rep. 193; Brinkley Car Co. v. Cooper, 60 Ark. 545, 31 S. W. 154, 46 Am. Rep. 216), and in that connection made the following observations:

"The difficulty about these cases is that they either impose upon owners of property a duty not before imposed by law or they leave to a jury to find all legal negligence in cases where there is no legal duty to exercise care. In these cases the courts, yielding to the hardships of individual instances where owners have been guilty of moral though not legal wrongs in permitting attractive and dangerous turntables and water holes to remain unguarded on their premises in populous cities, to the destruction of little children, have passed beyond the safe and ancient landmarks of the common law, and assumed legislative functions in imposing a duty where none existed. * * *

"The case before us is not within the rule of law imposing upon the owner the duty not to permit any dangerous excavation to remain on his own land so near a street or highway as to injure persons who, while attempting to follow same, may by mishap fall therein, because (1) there is no evidence tending to show that the child was at the time of the accident traveling or attempting to travel the path, and such duty is not imposed as to persons who approach the excavation by any other route, and (2) the path not being a public road but merely for the use of persons going to and from the platform on business connected in some way with the company, the invitation to use it would probably not apply to the child in this case, and therefore the law did not impose the duty above mentioned on the railroad as to it; such duty being imposed only as to persons thus invited to use the path."

In further support of the contention that a duty to foresee probable injury to the employees of the Gulf Production Company, while engaged in the duties of their employment requiring them to go upon the water tank, did not include the duty also to foresee probable injury to Webbie Touchstone, who was not so employed, appellant has cited St. L. S. W. Ry. Co. v. Pope, 98 Tex. 535, 86 S. W. 5, and City of Dallas v. Maxwell (Tex. Com. App.) 248 S. W. 667, 27 A. L. R. 927, the opinions in both of which cases contain announcements of similar import to the quotation last made above from Dobbins v. M., K. & T. Ry. Co.

In the case of Brush Electric Light & Power Co. v. E. Lefevre, 93 Tex. 604, 57 S. W. 640, 49 L. R. A. 771, 77 Am. St. Rep. 898, which is also relied upon by appellant, it was held that the light company was not liable to plaintiffs for the death of their son, resulting from contact with the defendant's electric wires, which were suspended across the street; the ends of which were fastened to awnings. Plaintiff E. Lefevre, the father of the deceased, Paul Lefevre, went upon the awning and fastened a rope to the wires to lift them high enough to permit the moving of a house down the street. He then threw

the rope to his son, Paul, who was on top of the house which was being moved down the street. The father then caught hold of the wires, which were uninsulated, and received a shock which caused unconsciousness. Paul, seeing the condition of his father jumped from the top of the house onto the awning, and, with the help of another, released the father from the wires, and, he being restored to consciousness, Paul fell from some cause, and his father fell likewise upon him on the top of the awning. Paul caught with both of his hands the two wires extending from the trestle to the awning and received a shock that produced his death. After reciting those facts, the court said:

"There is no evidence that this awning was ever used as a place of resort or for any purpose whatever by persons going upon the top of it, and the photographic views of it which were in evidence and are in the statement of facts indicate that it was simply an awning built for shade and protection to the sidewalk and the front of the house to which it was attached. * * * There can be no liability for the injury in this case, unless, from all the circumstances, the electric light company could reasonably expect that some person might be injured by its failure to cover the wires placed by it upon the awning where the deceased received his injury. Texas & Pacific Railway Co. v. Bigham, 90 Tex. 225, 38 S. W. 162. In the case cited, Chief Justice Gaines, on behalf of the court, expressed the rule in the following language, quoting from the Supreme Court of the United States in the case of Milwaukee Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256: ' "But it is generally held that, in order to warrant a finding that negligence or an act not amounting to wanton wrong is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act and that it ought to have been foreseen in the light of the attending circumstances." This is probably as accurate a statement of the doctrine as can be given, and is substantially that generally laid down by the authorities.'

"Applying this rule to the facts of this case, the inquiry arises, Would an ordinary prudent man, looking at the surroundings as they then appeared, have reasonably expected that any person would be upon the awning and might be injured by coming in contact with the exposed wires? If such a consequence might have been reasonably foreseen, then the plaintiff in error would be liable for the injury, under the facts of this case, unless there be some other defense; if not, then it cannot be held liable for the death of Paul Lefevre. If the testimony is such that a jury might have found that the electric light company ought to have anticipated the injury, then this court cannot inquire into the correctness of such a conclusion, although it might differ with the jury as to the correctness of the verdict. In the facts of this case, there is not a scintilla of proof that the awning had been used by any person as a place of resort either for pleasure or for business. Looking at the photographic views of the situation, the awning appears to be such as is common in the towns and cities as a protec-

tion to the front of the building, with no railing or other protection upon the top or roof showing the intention for persons to resort there for any purpose whatever If a man of ordinary prudence had been placing the wires at the same points, the facts would not have notified him that probably some one would be injured by them. From the street and the sidewalk to the place where the exposed wires were located is a distance of about 16 feet, which must have been at least 10 feet above the heads of men of ordinary height passing along the street, and there were no means by which passers upon the street or sidewalk could come in contact with the wire. It was therefore not negligence with regard to persons traveling along the street or sidewalk to leave the wire exposed, because there was no reasonable, and scarcely a possible, chance for such persons to be injured thereby. We are of opinion that there is no evidence upon which a jury could base a verdict in favor of the defendants in error, and the trial court erred in refusing to give the requested instruction to find for defendant."

In Burnett v. Fort Worth Light & Power Co., 102 Tex. 31, 112 S. W. 1040, 19 L. R. A. (N. S.) 504, a boy 12 years of age, while trespassing upon the roof of a building to which he gained access by a stair and trapdoor, was killed by coming in contact with a guy wire, which had become charged with electricity through the neglect of the light company to comply with penal ordinances of the city respecting the insulation of their wires. The court held that the parents were not entitled to recover, because the deceased was clearly a trespasser upon the roof of the building. The following is an excerpt from the opinion rendered in that case:

"In the case of City of Greenville v. Pitts, 107 S. W. 50, referred to in the certificate, it was distinctly held that the city was not liable for the injury inflicted in that case, for the reason that the plaintiff went upon the building in pursuit of his own business without invitation or express permission from the owner thereof. This was in accordance with the ruling in the case of the Brush Electric Light & Power Co. v. Lefevre, 93 Tex. 604, which is also referred to in the certificate. The reasoning of the court upon which that opinion is based is, that since there was not a scintilla of evidence that the awning over which the wires were stretched 'had ever been used by any person as a place of resort either for pleasure or business,' therefore the injury could not have been anticipated, and the defendant was not liable."

Houston Light & Power Co. v. Walsh (Tex. Civ. App.) 177 S. W. 1055, was a suit by Walsh to recover damages for personal injury sustained by him as the result of a fall occasioned by the giving away of an awning. The power company had weakened the awning by cutting a girder which supported it in order to make a place for a light post. Plaintiff and 15 or 20 other people went out upon the awning to view a circus parade passing along the street. Access to the awning was through

windows opening out upon it. The Court of Civil Appeals of San Antonio held that plaintiff was not entitled to recover, and in the opinion the following was said:

"The evidence is sufficient to show that crowds had been on this awning on former festive occasions, but there is no evidence to show that the Power Company knew that the awning had been so used."

The court further held that there were intervening acts of negligence between the negligence of the defendant in cutting the girder of the awning and plaintiff's injury, which precluded the conclusion that plaintiff's injury was the natural and probable result of defendant's negligence in cutting the girder; the intervening acts of negligence being that of the crowd in going upon the awning and that of the persons in charge of the building in permitting them to do so. An application for a writ of error from that decision was refused by our Supreme Court.

In the case of Kruse v. H. & T. C. Ry Co., 253 S. W. 623, the Court of Civil Appeals at Galveston held that the trial court properly instructed a verdict in favor of the railway company, which was sued for damages by Kruse for personal injury sustained by him when a rotten plank in the company's platform gave way and caused him to fall. The platform was maintained by the railway company for receiving cotton for shipment over its road, and at the time of his fall plaintiff was engaged in weighing cotton on the platform; the cotton having been bought by him for the purpose of shipment over defendant's road. It was held that the plaintiff was a mere licensee to so use the platform, that he was required to take it as he found it, and that the railway company owed him no duty to keep it in a safe condition for such use.

In G., C. & S. F. Ry. Co. v. Bennett, 110 Tex. 262, 219 S. W. 197, in an opinion rendered by Chief Justice Phillips, it was held that Bennett had no cause of action against the railway company for injury sustained by him in fighting a fire that had started through the negligence of defendant's employees in causing an explosion of an oil tank car. In that opinion the following was said:

"Under the authority of Seale v. Gulf, C. & S. F. Ry. Co., 65 Texas, 274, 57 Am. 602, and Texas & P. Ry Co. v. Bigham, 90 Texas, 223, 38 S. W 162, the negligence of the defendant's employees in the origin of the fire cannot be justly regarded as the proximate cause of the injury to Bennett. The test of this question is, Ought the defendant and its agents to have reasonably foreseen that as the consequence of the negligence which caused the explosion in the tank car, the injury to Bennett, or like injury to some other employee in his situation, would probably result? In the language of Judge Gaines' opinion in the Bigham Case, nothing short of prophetic ken could have anticipated the happening of the combination of events which resulted in Bennett's becoming overheated."

In S. A. & A. P. Ry. Co. v. Behne, 231 S. W. 354, by the Commission of Appeals, a recovery was denied because of the conclusion reached that the injury complained of could not reasonably have been anticipated as a probable result of the negligence of the defendant, upon which the right of recovery was based. And in the opinion in that case what was said by Judge Phillips in the Bennett Case was quoted with approval.

Rucker v. Sherman Oil & Cotton Co., 29 Tex. Civ. App. 418, 68 S. W. 818, was a suit for damages for the death of Rucker, who was killed by coming in contact with an uninsulated electric wire strung by the defendant company over an awning. Rucker was a lineman in the employment of another company, and was at work on the awning, assisting in the erection of a pole. A judgment rendered in favor of the defendant on an instructed verdict was reversed for failure of the court to admit proof offered by the plaintiff that the awning had been frequently used by persons going on the roof to repair and paint the awning and walls of the building, and to put in telephone connections. In the opinion in that case, written by Justice Fly, the following was said:

"All the uses that were made of the awning, except those made of it by trespassing boys, were ones that might have been reasonably anticipated, and, if the company owning the wires knew or should have known that the awning was put to such uses, it would be liable for damages caused to any one lawfully on the awning, whether he was using it for the purposes that the others did or not. The fact that persons went on the awning for certain lawful purposes put the oil and cotton company on notice that others might go there for other lawful purposes. 'A company maintaining electrical wires, over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have the right to go, either for work, business, or pleasure, to prevent injury. Joyce, Electric Law, § 445, and authorities cited; Overall v. Light Co. (Ky ) 47 S. W. 443; McLaughlin v. Light Co. (Ky.) 37 S. W. 856, 34 L. R. A. 812; Schweitzer's Adm'r v. Electric Co. (Ky.) 52 S. W. 830; Perham v Electric Co. (Or ) 53 P. 14, 24, 40 L. R. A. 799, 72 Am. St. Rep 730. There is nothing in the evidence that indicates that deceased was a trespasser on the awning, but, on the other hand, it may be inferred that he was there with the implied permission of the owner, and engaged in the lawful prosecution of his work. As said by the Supreme Court of Louisiana in Clements v. Electric Light Co., 11 So 51, 16 L. R. A. 43, 32 Am. St. Rep. 348, if the wire 'passed over a roof to which people in adjoining rooms had access, and where, in course of time, mechanics must go to make repairs, or laborers to sweep off or clean, it was the duty of the company, independent of any statutory regulation, to see that their lines were safe.' The fact that workmen had frequently gone on the awning to make repairs, and that telephone employees had gone there to make con-

nections, was proof that it was a place where people went for business, and raised the question of negligence on the part of appellee, that should have been submitted to the jury."

Many other decisions from this state and from courts of other states are cited in briefs of counsel for both sides, which we shall not attempt to review at length, since to so do would unduly prolong this opinion and lead to no satisfactory conclusion upon the question now under discussion, and since those authorities are upon different facts, and some of them, at least, are difficult to reconcile with others.

[1, 2] We have had considerable difficulty in determining the question now under discussion, but have reached the conclusion that the same should be decided in favor of appellee for the following reasons: It cannot be doubted that it is negligence to maintain an uninsulated wire highly charged with electricity, and without any warning of danger, in any place where persons may reasonably be expected to come in contact therewith. And we are of opinion that the pivotal and controlling question in this case is whether or not the evidence was sufficient to warrant a finding by the jury that the appellant should reasonably have anticipated that some person might probably go upon the running board of the water tank under circumstances similar to those upon which Webbie Touchstone went thereon, and while there might probably sustain injury from the electric current passing through its uninsulated wires, the danger from such wires being a hidden danger, and no warnings against the same having been posted.

[3] That such is the test of appellant's liability, we think is settled by the decisions in T. & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162; Brush Electric Power & Light Co. v. Lefevre, 93 Tex. 604, 57 S. W. 640, 49 L. R. A. 771, 77 Am. St. Rep. 898, and G., C. & S. F. Ry. Co. v. Bennett, 110 Tex. 262, 219 S. W. 197, cited above, and we do not believe that any of the other decisions cited are in conflict with those decisions upon that particular point. If appellant could reasonably have anticipated some injury to some person situated as was the deceased, who might be expected to probably go upon the tank under like circumstances, then it owed the duty to exercise ordinary care to avoid such injury. We are of the opinion further that the evidence was sufficient to sustain the finding of the jury upon that issue, and that the court did not err in refusing the appellant's request for an instructed verdict in its favor. It is to be noted that, while appellant had the lawful right to maintain its wires strung through the air, that right did not include the right of possession and control over the water tank and the lease on which the same was erected. And the act of the deceased in placing himself in dangerous proximity to the wires was not a trespass upon appellant's right to maintain them at the place where they were placed, nor inconsistent with that right. If, as testified to by plaintiff, the boy was told by the superintendent of the oil lease to go upon the tank to look for his cattle, then it must follow that he was rightfully there, and not a mere trespasser.

[4, 5] According to testimony introduced, the tank with the plank extending across the top of it, supported in the middle by an upright stay secured at the bottom of the tank, had already been constructed and used before the electric wires were installed. That the plank was so placed to enable persons to walk thereon, we think was reasonably apparent to appellant's employees at the time the wires were installed. We are of the opinion further that those employees should reasonably have anticipated that persons rightfully upon the lease might probably walk thereon, even while not engaged in the performance of any duty in connection with the business of the Gulf Production Company. We believe that the contention made by appellant that, as a conclusion of law, it could not reasonably have anticipated that any one would use the runway except employees of the Gulf Production Company, and that they would use it only for the purpose of cleaning out the tank or some other purpose of like benefit to the owner, cannot be sustained in view of the particular facts in this case. If Webbie Touchstone was rightfully on the runway, we do not think that the fact that he had been in swimming just before he came in contact with the electric current is of controlling effect in appellant's favor, since no evidence was introduced to show that he would not have been killed while standing on the runway, with his hands extended above his head, if he had not theretofore been in swimming. And we believe the evidence was sufficient, prima facie, to show the contrary Nor do we think it was of controlling importance that permission given him to go upon the tank to look for the cattle did not include permission to go in swimming after going upon the runway, since the permission so given was the permission to stand upon the runway, at all events.

[6] The evidence did not conclusively establish contributory negligence on the part of the deceased in going upon the tank as further insisted by appellant. According to the testimony of his mother, he had had little opportunity to know of the hidden danger of uninsulated electric wires, and the evidence further shows that no warning notices had been posted of such danger at or near the tank. Nor was there any evidence to show the fact that the wires were not insulated was apparent to a person in his position.

[7] It is also insisted that the evidence was insufficient to show that appellant maintained and operated the power line, of which the

wires in question were a part. On that issue Holman Cook testified as follows:

"I understood the wires over the tank were the wires of the Oil Belt Power Company."

Plaintiff, Mrs. Touchstone, testified:

"I remember when the wires of the Oil Belt Power Company were built along there, some time about 1921. The tank was built before the wires of the Oil Belt Power Company were placed there."

That testimony was sufficient prima facie proof that appellant owned and maintained the wires; especially in the absence of any testimony of appellant to the contrary, since the fact of whether or not it did own and maintain the line was peculiarly within its own knowledge. M., K. & T. Ry. Co. v. Day, 104 Tex. 237, 136 S. W. 435, 34 L. R. A. (N S.) 111.

[8] There was no error in the court using the term "concealed danger" with reference to the deadly current in the wires, since no one could tell by merely looking at a wire the voltage of electricity it carries or whether or not it carries any at all.

[9] Bills of exception were reversed to the following remarks made by counsel for plaintiff in the closing argument to the jury:

"How much difference, gentlemen of the jury, is there between a boy falling in a tank of water and coming within the zone of a wire that is laden with electricity, which, if he approaches it close enough that the wire—that the electricity will jump from the wire and has sufficient power to strike him dead? One, the danger is open and obvious, and the other, the danger is concealed; but Rollins might know, Funderburk might know, Mr. Goggans might know, of the danger, because they have been around electric wires. They have lived in cities where they have electric plants, but the proof in the case shows that this boy, all the days of his life, had lived with his mother, and she says that she never had electric lights; that he had never been around them, and the danger incident to it was unknown to him, a 16 year old boy out there that puts his hands up in the neighborhood of a wire that looks like a telephone wire, running harmlessly; why, I did not know until a few years ago that unless you come in contact with a wire there was any danger of being shocked, did you? Did you know, gentlemen of the jury, until you heard this testimony, that it was not necessary for a man to come in contact with a wire in order to be killed?"

Also to the following remarks:

"This plaintiff says that year after year she had seen people in swimming there, yet they tell me this 16 year old boy should not have gone up there because a person of ordinary prudence would not have gone; yet there is no warning there, nothing to tell him to stay off."

Counsel for the defendant did not interrupt the speaker at that time, but handed the court a memoranda of his objections to those remarks, which the court overruled. The grounds of objection were that there was a proof that there was any danger zone of liability of injury without coming in contact with the wires, and that there was no evidence that deceased did not come in contact with them. Since the witness who testified to seeing the electricity run down the body of the deceased did not undertake to say whether his hand touched the wire, we think the jury would have the right to infer that the current passed into his body without actual contact with the wires, if the same were not touched by the hands of the deceased; since, in that event there would be no other way to account for the electric shock which deceased received. Hence we do not believe that there was reversible error in the argument based on that theory of the accident.

[10] The objection to the argument last quoted was that, while plaintiff had testified that she had seen pipe line men swimming in the tank, she did not testify that she had seen them in swimming year after year.

The jury had heard the testimony, and it was a mere matter of recollection as to what plaintiff had testified to on that point, and we do not think it is likely that they were misled by the argument. At all events, we do not believe that the misquoting of the testimony on that point should require a reversal of the judgment, especially in the absence of any testimony offered by the defendant.

[11, 12] We are unable to say that the amount of damages awarded to plaintiff for the death of her son was so grossly excessive as to require a reversal of the judgment. If the amount of recovery should be limited to the value of what would have been the probable earnings of the deceased during his minority, based upon what he was earning for his mother at the time of his death, and what he would have continued to earn on the same basis, then it would seem that the verdict was excessive. But, as we understand the rule to be, plaintiff has a right to recover compensation for financial benefits which she had reasonable expectations of receiving after her son reached his majority, and we think the testimony was sufficient to warrant a finding in plaintiff's favor upon that issue.

For the reasons stated, all assignments of error are overruled, and the judgment in plaintiff's favor against the appellant is affirmed. The judgment in favor of the other defendants, of which no complaint is made, is left undisturbed.