### KRUSE v. HOUSTON & T. C. R. CO.
### (No. 8388.)

(Court of Civil Apeals of Texas. Galveston. June 7, 1923.)

**1. Negligence ⟲⟳32(2)—Licensee defined.**

In determining whether one was an invitee or licensee, the general test is whether he had present business relations with the owner of the premises which would render his presence of mutual aid to both, or whether his presence there was for his own convenience or on business with others than the owner, and in absence of some relation inuring to the mutual benefit of both he is a licensee.

**2. Railroads ⟲⟳274(2)—Merchant weighing cotton on freight platform held a licensee not entitled to recover for injury.**

Where a merchant was on a railroad company's cotton platform to weigh cotton he had purchased from third persons to ascertain what amount he would pay, and the company had no interest in the transaction, *held*, that he was a mere licensee, though cotton so weighed was usually thereafter shipped over the company's railroad, and the company was not liable for his injuries from defective planking.

Appeal from District Court, Fayette County; M. C. Jeffrey, Judge.

Action by William Kruse against the Houston & Texas Central Railroad Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Baker, Botts, Parker & Garwood. of Houston, C. D. Krause, of La Grange, and Garrett, Brownlee & Goldsmith, of Austin, for appellant.

George Willrich and John T. Duncan, both of La Grange, for appellee.

PLEASANTS, C. J. This suit was brought by appellant against the appellee to recover damages for personal injuries alleged to have been caused him by the negligence of appellee. The substance of the pleadings is sufficiently stated in appellant's brief, as follows:

"Plaintiff alleged, in substance, that he was a merchant and had been weighing and placing cotton on defendant's cotton platform for 28 or 29 years at the invitation of defendant; that defendant's trains during this length of time would pull up to the cotton platform, load the cotton for which defendant had issued bills of lading, and haul same to market, and plaintiff would pay defendant for such hauling; that the defendant had no other platform upon which to load cotton; that this platform was constructed and maintained by defendant upon which to place cotton; that the planks in said platform had become rotten in places; that in some places these rotten planks did not show, still they were rotten and if a person would step upon same the plank would break; that the platform was about four or five feet off the ground, and if a person broke through one of these planks his leg or legs would not reach the ground; that defendant knew of the defective condition of this platform before plaintiff was injured and failed to repair same; that plaintiff did not know of the defective plank or planks where he fell through; that same was not apparent; that on or about September 29, 1921, this plaintiff, while weighing some cotton on said platform, and exercising care and caution weighing said cotton on said platform, for the purpose of shipping same on defendant's trains, stepped on a plank that was rotten and fell through same; the platform being too high for his leg to reach the ground, his leg was caught with weight of body on same; that he thereby received severe and permanent injuries; that he suffered great physical and mental pain and has been damaged in the sum of $250 doctor's bill, $25 drug bill, and in the sum of $15,000 physical and mental pain and suffering and for his diminished capacity to work.

"Defendant pleaded, in substance, general demurrer, general denial, and that if plaintiff sustained any injuries same were caused by plaintiff's failure to exercise ordinary care; that if its platform was defective, which it did not admit, then such defective condition was well known to plaintiff; that he failed to use ordinary care for his own protection; that he was guilty of negligence which proximately caused or contributed to cause the accident and plaintiff's alleged injuries; that plaintiff went upon said platform upon business of his own, in no way connected with defendant's business, directly or indirectly; that plaintiff was merely a licensee upon said premises and assumed any and all risk incident to the condition of said platform; that with full knowledge of its condition, and being on said platform on his own personal account, plaintiff assumed all risk, danger, or injury that might result on account of condition of platform."

After hearing the evidence the trial court instructed the jury impaneled to try the cause to return a verdict in favor of the defendant, and upon return of such verdict rendered judgment in accordance therewith. The evidence shows that appellant was

injured, as alleged in his petition, by the giving way of a rotten plank in a platform belonging to appellee and upon which plaintiff at the time of the injury was engaged in weighing cotton which he had purchased from one of his customers. The platform was erected and maintained by appellee for receiving cotton for shipment over its railroad.

Plaintiff testified, in substance, that he had been using this platform for many years for receiving and weighing cotton bought by him, and that defendant had permitted and acquiesced in such use by him, and had permitted him to erect a shed and place scales on the platform for weighing cotton; that he had also shipped cotton over defendant's road from this platform for a number of years; that sometimes he bought cotton by the gin weights and did not reweigh it himself; that after he placed cotton on the platform, if he did not sell it, when he was ready for shipping it he would get a bill of lading therefor from the appellee, and it would be loaded by appellee from the platform into or on its cars for shipment. As to the transaction in which he was engaged at the time he was injured he testified:

"On this particular day I had gone there to weigh some cotton which I had bought from a negro by name of August Griffin. I think he had three bales. I don't remember. I think he had three bales. I think I had agreed on the price before I went to the platform. It seems to me like I did. I bought it and then after I said what I would pay I went to the platform to weigh the cotton to see how much I had to pay him. I don't remember; I suppose it was several days afterwards I sold this cotton to Mr. Neese. I think I weighed it there on the 29th and sold it five or six days after that time. When I weighed this cotton I tagged it and put it to one side. I own the scales which were used to weigh the cotton; they were my scales. The scales were put there by us and Mr. Sturmer, and we went in and put up a little shed and bought the scales and put there to have a way of weighing cotton, a weighing shed put up on the platform of the company. The scales belonged to me. When I went there after I had bought this cotton from this colored man, August Griffin, this three bales, I went there for the purpose of weighing the cotton in order to ascertain the weight in order to settle and pay; then after I did that I trucked the cotton to one side and left it there. After a few days I sold this particular cotton with some other cotton to Mr. Neese. I had been weighing cotton there for several years, practically since the platform was constructed, and Mr. Sturmer and I had bought scales and we put up a shed there to weigh cotton as parties would come in and sell; we would buy and take it there and weigh to ascertain the weights for the purpose of settling with the men we bought from; that is correct. Sometimes we would take gin weight and not weigh; but on this we did not take the gin weights. I had bought from the colored man Griffin and he and I went to the platform to weigh the cotton on these scales."

August Griffin, a witness for appellant, testified:

"At that time when I took this cotton there Mr. Kruse had bought from me, he had told me the price he would pay me, I think; I really don't know; I suspect he might have. I took it to the platform for the purpose of weighing to see how much money he would pay for the cotton, and that is what I was there for. He was weighing it for the purpose of knowing how much money he would pay me, and I was there with him at the time."

Appellee's agent, Ward, testified:

That he had known Mr. Kruse as a merchant during eight years and had seen him unload cotton on that platform many times, but did not see him that morning. "I would give him bills of lading for cotton and send it off. I was willing for him to come and place the cotton on the platform for shipment on our trains. It is customary; that is what the platform was built for, for our customers, the merchants, to come and unload the cotton there for our trains to haul off." "The people would bring the cotton and weigh and stack on the platform; then when they would come in to ship the cotton, I would issue bills of lading." "Take, for instance, this particular three bales of cotton that was weighed there on this particular occasion; he could have come and carried it away anywhere. I simply permitted them to come and weigh the cotton and stack off to one side, and when they got ready to ship they came and got bills of lading and the cotton is shipped out. This particular cotton was shipped out by Mr. Neese on the 7th of October. The railroad company did not own the scales at all and did not put the shed up there, and this particular platform I speak of is there for the purpose of bringing cotton to us for shipment, and I would receive the cotton when it was ready for shipment and issue bills of lading and ship it off. The railroad company had no interest in Mr. Kruse weighing the cotton that morning; had no interest in it at all. I did not know that they were down there at all. They could have come and carried off the cotton anywhere else. I have seen cotton taken off that platform and carried home after it was taken there and weighed. This cotton was shipped off. When cotton was brought there, we did not always let it be collected on the platform until we had a carload; we would ship locally at times; they would sometimes ship two or three bales at a time, but mostly more. We usually tried to ship by the carload whenever we could do that. We do not hold the cotton back to get a carload after it is under bill of lading."

The evidence as to the condition of the platform and appellant's knowledge thereof is shown by the following testimony of appellant:

"This platform where I have stated I was weighing cotton was in pretty bad condition. Of course, there was a plank here and there not rotten, some rotten places; some places showed and some did not; the splinters showed, and sometimes you can roll a truck over and a wheel would break through a little hole and leave a little crack, and some planks were

rotten on the end; I mean little rotten places in it. In moving about on this platform I was pretty particular because I saw there was bad places on the platform; I was particular as I moved about on it, but I did not see this hole, this rotten place. It is my best recollection that that platform was built six or seven years ago, and it had holes in it. I never did notice the holes were so bad in that platform until the season began in August, and during the season it had been awfully wet and the water had stood on it and rotted some places. Some of the holes and cracks anybody could see and some you could not. You could see the holes, certainly.; I don't known how long I had known the condition of the platform; several months, I suppose, after I got to weighing cotton in the fall. Anybody could see the condition. At the time I was weighing this particular cotton, I don't think August Griffin called my attention to the holes. I think I told him to watch out. I said 'to look out; there is holes around here and you have to be a little .careful.' I don't think he told me the same thing. We were both looking out for holes and bad places on the platform. I think it was about 11 or 11:30 on a clear' day that we were weighing the cotton; it was right around noon; I think it was between 11 and 12, and my best recollection is that it was a clear day."

Appellee's agent, Ward, testified that he did not know of the bad condition of the platform until he was told about it by appellant. This was before appellant received his injuries.

From the foregoing statement it appears that there is no conflict in the testimony. The platform was in an unsafe condition, and this was a proximate cause of appellant's injury.

Aside from the question of assumed risk or contributory negligence on the part of appellant in going upon the platform and weighing cotton thereon in its known condition, the only question presented is whether the relation between appellee and appellant at the time of his injury was such that appellee's failure to have the platform in a reasonably safe condition was negligence of which appellant can complain. In other words, did appellee owe appellant any duty to keep the platform in a safe condition for the use appellant was making of it at the time he was injured? If appellant was on the platform and using it for purposes beneficial alike to himself and appellee, or for purposes connected with appellee's business and for which the platform was constructed and maintained, he was there by the implied invitation of appellee. and it owed him the duty to have the platform in a reasonably safe condition.

On the other hand, if he was there for purposes of his own in no way connected with appellee's business and was by the express or implied permission of appellee using the platform for his own benefit, he was a mere licensee, and was required to take the platform as he found it; appellee being under no duty to make it safe for his use.

In Street on Personal Injuries, § 153, the rule is thus stated:

"Persons entering for their own pleasure or advantage on the premises of another by the permission, express or implied, of the owner or occupier, are licensees. They take the premises as they find them; a mere naked license imposes no duty on the owner or occupier to provide against danger or accidents growing out of the unsafe condition of the premises."

This general rule is universally recognized by the authorities. Oil Co. v. Morton, 70 Tex. 400, 7 S. W. 756, 8 Am. St. Rep. 611; Kirby Lumber Co. v. Gresham (Tex. Civ. App.) 151 S. W. 847.

[1] The only difficulty in the application of the rule is to determine from the facts of a particular case whether the person injured upon the premises of another was upon the premises as an invitee or was merely a licensee. In determining this question the general- test is whether the injured person, at the time of the injury, had present business relations with the owner of the premises which would render his presence of mutual aid to both, or whether his presence on the premises was for his own convenience, or on business with others than the owner of the premises. In the absence of some relation which inures to the mutual benefit of the two. or to that of the owner, no invitation can be implied, and the injured person must be regarded as a mere licensee.

In the case of Bennett v. Railway Co., 102 U. S. 577, 26 L. Ed. 235, the Supreme Court of the United States, speaking through Justice Harlan, says:

"It is sometimes difficult to determine whether the circumstances make a case of invitation in the technical sense of that word, as used in a large number of adjudged cases, or only a case of mere license. 'The principle,' says Mr. Campbell, in his Treatise on Negligence, 'appears to.be that invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it.'"

[2] Applying these tests to the facts of this case, we think the trial court properly held that appellant, at the time of his injury, was a mere licensee on the platform, and appellee, as a matter of law, could not be held liable for injury to appellant caused by the defective condition of the platform. All the evidence shows that appellant was upon the platform at the time of his injury for the sole purpose of weighing the cotton which he had purchased from August Griffin in order that they might ascertain what amount he would pay for the cotton. Appellee had no interest in this transaction and could not possibly have derived any benefit therefrom.

The permission given by appellee to ap-

pellant and other merchants of the town to construct a weighing shed on the platform, place scales thereon, and there receive, weigh, and store cotton purchased by them, imposed no positive duty upon appellee to keep the platform safe for such use, and the mere fact that cotton so received, weighed, and stored on the platform was, without any such obligations on the part of its owners, usually thereafter shipped over appellee's railroad, would not make the weighing and storing of the cotton a transaction of mutual benefit to both appellant and appellee. The benefit, if any, to appellee from the use appellant was making of the platform at the time he was injured was too contingent and remote to justify the holding that appellant was on the platform at that time by the implied invitation of appellee, or that appellee was under any duty to keep the platform in a safe condition for the use appellant was then making of it.

The facts of this case easily distinguish it from the case of Ry. Co. v. McCarty, 40 Tex. Civ. App. 364, 89 S. W. 805, Ry. Co. v. Thomas, 48 Tex. Civ. App. 646, 107 S. W. 868, and Foster Lumber Co. v. Rodgers (Tex. Civ. App.) 184 S. W. 761. In each of these cases the facts show that the injured party was on the premises of the defendant for purposes connected with the defendant's business and of mutual interest and benefit to both parties. In addition to this, in the Thomas Case the defendant was shown to have caused the plaintiff's injury by affirmative active negligence, and the question of whether plaintiff was an invitee or a licensee was immaterial.

We are of opinion that the judgment of the trial court should be affirmed; and it has been so ordered.

Affirmed.