WIMBERLY et ux. v. GULF PRODUCTION CO. (No. 8703.)

(Court of Civil Appeals of Texas. Galveston. July 2, 1925.)

1. Negligence ⊙⟳39—Shower bath house of defendant company, created for use of its employés, held not "attractive nuisance" as to 18 year old boy.

Shower bath house of defendant company, created for use of its employés, held not "attractive nuisance" as to 18 year old boy.

2. Negligence ⊙⟳32(4)—Boy of 18 years, entering defendant company's shower bath room without permission and for his own pleasure, held trespasser.

Boy of 18 years, entering defendant company's shower bath room without permission and for his own pleasure, held trespasser, or at most mere licensee, and not an invitee.

3. Negligence ⊙⟳32(2)—Implied invitation to enter premises does not exist, in absence of some relation which inures to mutual benefit of owner and person so entering, or to owner alone.

Implied invitation to enter premises does not exist, in absence of some relation which inures to mutual benefit of owner and person so entering, or to owner alone.

4. Negligence ⊙⟳33(1)—Owner of shower bath room, created for use of its employés, held not required to make it safe for use of one therein on his own pleasure, not connected with owner's business.

Owner of shower bath room, created for use of its employés, held not required to make it safe for use of one therein on his own pleasure, not connected with owner's business.

5. Explosives ⊙⟳7—Owner of shower bath room, erected for use of its employés, held not liable for injury from gas explosion therein to one on such premises as mere licensee, if not as trespasser.

Owner of shower bath room, erected for use of its employés, held not liable for injury from gas explosion therein to one on such premises as mere licensees, if not as trespasser.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action by W. O. Wimberly and wife against the Gulf Production Company. Judgment for defendant, and plaintiffs appeal. Affirmed.

Winfree, & Weslow, W. C. Perry, and Devereaux Henderson, all of Houston, for appellants.

Claude McCaleb, John Broughton, and John E. Green, Jr., all of Houston, for appellee.

LANE, J. This suit was brought by W. O. Wimberly and wife, Martha A. Wimberly, to recover the sum of $35,000; it being alleged they suffered damages in such sum by reason of the death of their son, John Wimberly, 18 years of age, who was fatally injured by an explosion of natural gas while in a bath room, owned by Gulf Production Company, on the 17th day of May, 1923. The plaintiffs alleged that defendant maintained a plant for drilling, storing, selling, and transporting oil and gas and oil and gas products, near Goose Creek, in Harris county, Texas; that in connection therewith it maintained a bath house equipped with shower bath apparatus and with fixtures for natural gas, which were used to heat the water used in said house; that the Production Company and its agents and servants in charge of its premises and bath house, had habitually permitted the public generally to use said bath house; that said house was especially fascinating and attractive to minors; that John Wimberly and other minors had frequently used the bath house with the knowledge and acquiescence of the Production Company, which amounted to an implied invitation for John Wimberly to use said bath house; that their son and his companions were led to believe and did believe that they were rightfully upon said premises; that the gas stove and pipes used for the purpose of heating the water used in the bath house were exclusively within the control of the defendant; that the gas was a dry natural gas, highly inflammable and explosive, and a highly dangerous agency; that defendant was aware of the danger of such gas and apparatus, bath house, and premises; that deceased was an immature youth, inexperienced in the control of gas, and in the operation of means and appliances for using same, and did not know the danger to which he was exposed; that defendant negligently and carelessly failed to warn deceased of the danger of using the gas, or to use any means to prevent the use of the bath house by children, but kept said house and premises open and easily accessible, and negligently failed to place about the premises and upon the bath house, or adjacent thereto, any signs warning persons thereon of the alleged dangers; that appellants' son and his companions had exercised due care for their own safety on the occasion of said explosion, and that the said fire and explosion were the direct result of the negligence of appellee in failing to maintain the gas pipes feeding the gas to the stove and other appliances in said bath house in a reasonably safe condition, and in permitting said gas stove, pipe, appliances, and apparatus to become old, worn, loose, weak, leaky, and defective, so that same were insufficient to contain, retain, and repress the amount of gas forced into said pipes and building by the natural pressure of said gas; that the explosion resulting from such negligence had severely injured and burned appellant's said son,

which injuries resulted in his death; that by reason thereof appellants had been deprived of the society and companionship of their said son, of his earnings during his minority, and of the amounts that he would have contributed to appellants after he had attained legal age, in all to their damage in the sum of $35,000, for which amount they prayed judgment of the court.

Appellee answered by general demurrer and general denial, and by special answer especially denied that the deceased, John Wimberly, was ever invited by appellee or any of its employés, who had authority so to do, either expressly or impliedly, to use the bathing facilities which appellee had provided for its employés; that said John Wimberly had entered upon said premises without authority, and was a trespasser, and that as such trespasser appellee owed him no duty, and was not bound to exercise any care for his safety. Further answering, appellee, while not admitting that John Wimberly was other than a trespasser on said premises, averred that the explosion resulting in the injury and death of said John Wimberly was the result of the contributory negligence of said John Wimberly and his companions, in that they entered upon said premises without notifying appellee or its employés of their intention to use said bathing facilities, and at an hour when appellee's employés in charge of said premises were absent or engaged in attending to duties in connection with the warehouse of appellee; that deceased, acting with his associates, were negligent, in that they failed to properly ignite the gas after turning same on, thereby permitting the gas to escape from the pipe in sufficient quantity to become dangerous, if a match was struck in said bath house; and that, after a dangerous amount of gas had been permitted to escape, the deceased, or one of his companions acting with him, had attempted to light said gas, or struck a match, which caused said gas to ignite, thereby causing the explosion and the resultant injuries.

After the plaintiffs had closed their evidence, the court instructed the jury selected to try the cause to return a verdict for defendant, which was accordingly done. Upon such verdict judgment was rendered for the defendant, from which the plaintiffs have appealed. On appeal, Wimberly and wife insist that the court erred in instructing a verdict for defendant, in that:

(1) "Whether the death of the deceased was the natural and probable consequence of the maintenance by appellee of defective apparatus, carrying a concealed and deadly amount of highly explosive natural gas, and whether in the light of the attending circumstances should have been foreseen by the appellee, was an issue of fact, which the trial court should have submitted to the jury for their determination." (2) "It was the duty of appellee

to foresee the dangers to and the probable presence of and consequent injury to any one who used the facilities of the bath house maintained by appellee on its premises; and the evidence was sufficient to warrant a submission to the jury of the question of whether or not appellee should reasonably have anticipated that some person might probably go upon the premises to take advantage of such facilities." (3) "There was evidence that the failure of the appellee to post notices or give warning of the danger attending the use of its appliances for heating the gas was negligence, and the trial court erred in refusing to submit the same to the jury." And (4) "the issue as to whether plaintiff's deceased was a trespasser, a licensee, or an invitee, was a question of fact for the jury."

They also insist that the maintenance of the bath house, equipped as it was, was something unusually attractive to persons of immature judgment, and that such maintenance was an implied invitation for the deceased to go upon the premises and use bathing facilities in the bath house for the purpose of taking a bath. We shall first dispose of the contention last mentioned. We think it would, indeed, be the establishment of a dangerous precedent to hold, under the doctrine of "attractive nuisances," that an ordinary bath house, equipped as the one in question is shown to have been, is an attractive nuisance, or that it is such a thing as would attract a young man of more than 18 years of age to enter it and use its appurtenances, so as to bring it within the doctrine of "attractive nuisances."

[1] Adopting substantially and almost literally the language of the court in the case of Shaw v. Chicago & A. Ry. Co. (Mo. Sup.) 184 S. W. 1154, we say: It would be a very exceptional state of facts which would render the doctrine of "attractive nuisances" applicable to a strong, active, healthy, and intelligent young man of more than 18 years of age. A part of the doctrine, the basis of it, is that the injured person is of such tender years that the "attractive nuisance" would so appeal to childish impulses as, in a sense, to constitute an invitation, and that such appeal should be foreseen, and care taken to prevent evil consequences. We are of the opinion that the deceased is not shown to have been within the class to which the doctrine applies. Shaw v. Chicago & A. R. Co. (Mo. Sup.) 184 S. W. 1154; Sage's Adm'r v. Creech, 194 Ky. 415, 240 S. W. 42. In the case from which we have practically quoted with approval it is said:

"The industry of counsel has unearthed one case applying the doctrine to a 14 year old boy. That case was exceptional in its facts. Biggs v. Wire Co., 60 Kan. 217, 56 P. 4, 44 L. R. A. 655."

We decline to apply the doctrine of "attractive nuisances" to the facts of the present case.

Having disposed of this contention just discussed, we are now brought to a consideration of the question as to whether the court erred in giving a peremptory instruction to the jury to find for the defendant. The only evidence introduced tending to show the circumstances under which deceased, John Wimberly, entered upon the premises and into the bath house of appellee, was the testimony of the witnesses P. T. Eichelberger and Frank Smith. Eichelberger testified as follows:

"My name is P. T. Eichelberger. I live at Goose Creek. I am 17 years old—will be 18 on the 5th of October. I have not lived at Goose Creek all of my life. I have lived there about 8 years. I was there when an explosion and fire occurred on May 17, 1923, on the Gulf Production lease, in the bath house right by the warehouse. That Gulf Production lease is located out south of Pelly. Pelly is part of Goose Creek; it is about three-quarters of a mile or a mile from Goose Creek proper. I don't know whether or not there is a particular name given to the premises on which that bath house is located; I don't know whether or not it is the Briggs lease, I don't know the name of it.

"There is a high fence around those premises. I could not be positive as to the amount of land included within that fence, but it is from 1½ to 2 acres. I am just guessing at that. All of that acreage is inclosed in a fence. The fence is about 8 feet high. The fence is made of a kind of iron netting. I think that lease is in the form of a square. There are three openings or gates in that fence that I know of. The north gate is the one we used to go through. There is a gate on the north side of this square, and then there are two other gates located on the south side. Those gates are large enough for a standard vehicle to go through. Those three gates, the one on the north side, and the two on the south side, are the only openings in that fence so far as I know. There are some buildings located within that inclosure. One of those buildings is a long building, and I suppose it is a warehouse. That building is located sort of on the west side of the fence. I don't have any idea how long that building is, but I suppose about 100 feet or so; it extends nearly the whole length of the premises. I don't know what they call that building, but I think it is a warehouse. There is also an office building on those premises, which is located in the southwest corner of this fence. I suppose the office building is about 14 by 30 feet, or something like that. That is just an ordinary one-story building. I think there is a sign on that building which says 'Office.' There is also another building in the southeast corner of the property, which I suppose is a bunk house, and there is also a bath house. That bunk house is about the same size as the office. There is a real small building back of this bunkhouse, on the north side of it, and that is the bath house. The bath house is about 14 by 14 feet, or something like that. There are some roads through these premises; those roads run north and south between the pipe racks. The road enters at the gate on the north side and goes out at the south gate. You can go out on that road at either the east or west gate on the south side. There is one road going in at the north gate and it turns a little southwest, and then it goes right on out at the west gate, and then there is another road; the branch comes in at the north gate; it branches off and goes out at the east gate. That road branches off about 25 or 30 steps from the north gate. There was some pipe on those pipe racks situated between the two roads on the day I went in there. The pipe racks are located in the middle of the yards, and extend from north to south.

"It was about 5:30 in the evening on the 17th day of May, 1923, that I went onto these premises of the Gulf Production Company which I have been talking about. I entered through the north gate, and came up the road, and walked down by the side of this bunkhouse, down this little platform by the side of the bunkhouse, and went around into the bath house. The north gate was open at that time. One of the gates on the south side of the premises was open on this occasion. There was a door on the bath house, and on this occasion that door was unlocked and open. I did not notice any signs on this fence around these premises on the 17th day of May, 1923. There were not any signs on the bath house. I have been going upon these premises since the fall of 1922.

"This fire and explosion occurred on Thursday, and I suppose it was May 17, 1923, I am not sure. I haven't the least idea how many times I had been upon these premises from the fall of 1922 down to the 17th day of May, 1923. I couldn't say positively, but it was 25 or 30 times that we had been in there altogether during the winter. I never did see any signs around the premises during the various times we were there. When we would go down there, we would sometimes see persons around there, and sometimes we did not. At that time I' didn't personally know any of the men I saw around there. I know who was in charge of these premises for the Gulf Production Company; it was a fellow by the name of Smith. I do not see Mr. Smith in the courtroom now, but I saw him here a while ago. I suppose I saw Mr. Smith 10 or 11 times on these trips down to that bath house. Mr. Smith never did say anything to me, but we would speak to him when we would see him. I don't suppose there was anything there to keep Mr. Smith from seeing us go into the bath house; I didn't see anything. I don't know whether or not there were any people in the office building at the time we went to the bath house. There was a pipe rack between the office in the southwest corner of the property and the bath house, but it was not high enough to obstruct the view, so as to keep a person from seeing us go into the bath house.

"It was about 5:30 in the evening of May 17, 1923, that we went down there. John Wimberly and Jeff Griffin were with me. I have known Jeff Griffin for a long time, and all I know is that he is just Jeff Griffin; he hasn't his right mind, or something. He lives there at Goose Creek. I don't know how old John Wimberly was at the time of this accident; he never

(274 S.W.)

did tell me how old he was, but I suppose he was about 17. Jeff Griffin was older than either John or I; he was about 18 or 20. We went into that bath house to take a bath. That was the purpose for which we went down there on the other occasions we had been there. Inside of that bath house there was a heater, stovepipes, a partition, and a bench. That was a shower bath. I suppose that bath house was about 14 feet square and about 8 or 10 feet high. There was a partition in the bath house which ran north and south, but it did not go all the way through the building.

"This place where the Gulf Production Company's warehouse is located is inclosed with about a 6 or 8 foot wire fence. There are gates in that fence, but they were never locked when I went there. I don't know whether they are locked at night. I don't know whether or not they have a night watchman there. I never saw him. There is a warehouse there, but I don't know whether or not·it is filled with valves and different things like that which are used around an oil field. I was never in that warehouse. I have never been invited into the warehouse. I never did ask for permission to go there and use those bathing facilities. I did not pay anybody for going there and using those bathing facilities, and nobody connected with the Gulf Production Company ever invited me to use those facilities. I just went down there because I wanted to take a bath.

"I testified by deposition in this case. I was asked in that deposition whether I ever asked anybody about whether I could go there, and I said I did not do so, and that I never got permission from any one to go there, but that I just went of my own accord. I went in on this property without asking permission of any·one, or seeing any one about it. I knew Fred Smalley; his father worked for the company there. I don't know anything about whether or not Fred Smalley stayed there in that bunk house. I don't remember to have seen Fred Smalley there at the bunk house on the company's property. I know Mr. Frank Smalley It is not a fact that Mr. Smalley met us boys there one afternoon and asked us if we had permission to use those bathing facilities, and that we told him, 'No,' and that he then told us we had better get out unless we had permission, that we were liable to get hurt. Nothing like that occurred. John Wimberly had been in that bath house the same number of times I had, about 25 or 30 times. We generally went down there around 4, 5, or 5:30 o'clock. We were never much later than 5:30. I suppose that Mr. Smith, who was in charge of that property, saw me in that bath house. We spoke to him one time when we were leaving the bath house. He was out there in the yard at that·time. That bath house is not but about 25 or 30 steps from one of the south gates.

"It is a fact that I was asked the following questions at the time my depositions were taken, and I made the following answers: 'Q. You don't know whether anybody saw you in there or not? A. No, sir; I don't know for sure that anybody seen me or not, but I have seen several people. Q. You just happened to see them as you were passing along? A. Yes, sir. Q. You don't know whether they saw you or not? A. No, sir; I don't know whether they saw me or not. Q. And you don't know the officers of the company ever knew you were in there bathing or not? A. No, sir; .I don't know whether they knew it or not.' That is the truth about the matter; just as I testified then and I testify now. There were not any signs around that bath house inviting us to bathe there. So far as I know, none of the officers of the company or any of its agents ever invited anybody to bathe there. I don't know whether they did or not.

"We would be passing from the bath house when we would generally see the people around there; sometimes, when we would go in, we would see a few people around there; and sometimes when we came out. I suppose that, out of the 30-odd times I was in that bath house, I saw men there 10 or 12 times. I suppose that I saw Mr. Frank Smalley around there some three, four, or five times. We could not have gotten in at the southeast gate to those premises without somebody seeing us, if they would happen to be looking for us,· or looking anywhere around there in the yards, or if they had been looking towards the south gate. I suppose we could have come in around behind that bath house without them seeing us, but we didn't do that. On the occasions that I went into that bath house, I came in at the north gate, came down by the pipe rack, and right up in front of the bunk house, and down the side of the bunk house on that walk. That walk leads from the road there on the premises back to the bath house, towards the back end of the bunk house. The distance from the north gate to the bath house is all the way across the property, excepting about 25 or 30 feet; I suppose it is about 50 or 75 yards from where I entered the north gate down to the bath house.

"We would walk the same way we would as if we were going to walk through the yards and out the gate. It is a fact that the following questions were asked me in my deposition, and I made the following answers: 'Isn't it a fact you always went there late in the evening, after' you quit work? A. Yes, sir. ·Q. About what time? That is 5 or 6 o'clock, isn't it, in the evening? A. Yes, sir; after 5 o'clock. Q. Isn't that a time when there isn't many people there? Isn't that time there late in the evening, when the employés of the company quit work? A. Yes, sir: I suppose they do quit or turn off for the day. Q. They always quit off for the day? A. Yes, sir; along 5 or 6 o'clock. Q. So, when you went there, there wouldn't be apt to be many people there, would there?. A. No; we never did see very many people there. Q. You never did see anybody? A. Yes, we would see them there, all right; but we never did see very many; every now and then we would see some fellow. Q. It is a fact that you always went there late in the evenings? Yes, sir.'

"It was about 5:30 in the evening on the 17th day of May, 1923, that I went onto these premises of the Gulf Production Company, which I have been talking about. I entered through the north gate, and came up the road, and walked down by the side of this bunk house, down this little platform by the side of the

bunk house, and went around into the bath house. I never did ask for permission to go there and use those bathing facilities. I did not pay anybody for going there and using those bathing facilities, and nobody connected with the Gulf Production Compny ever invited me to use those facilities. I just went down there because I wanted to take a bath.

"Q. You don't know whether anybody saw you in there or not? A. No. sir; I don't know for sure that anybody seen me or not, but I have seen several people.

"Q. You just happened to see them as you were passing along? A. Yes, sir.

"Q. You don't know whether they saw you or not? A. No, sir; I don't know whether they saw me or not.

"Q. And you don't know the officers of the company ever knew you were in there bathing or not? A. No, sir; I don't know whether they knew it or not. That is the truth about the matter, just as I testified then, and as I testify now."

Frank Smith testified as follows:

"As to whether I ever saw anybody enter the building, I have seen the Lowe boy go in there. I have seen some of the boys, a couple of the boys, go in there, and I imagine they went in there to take baths. As to whether I would have had any objection to those boys coming in there and using the bath house, I would have asked them by what right, if I had known it. The question as to who gives that permission was never put to me. My orders were not to allow any one to trespass, and I think I would have taken that as trespassing. I have never ordered any one off the premises; never had the question put up to me. I never had occasion to order any one from the premises."

[2, 3] We are inclined to the opinion that the evidence shows that the deceased was a trespasser upon the premises of appellee at the time of his injury, and by no manner of reasoning can it be held that he occupied a higher standing than a mere licensee. There was no evidence to show that he was an invitee. At the time of his injury he had no business relations with appellee, the owner of the premises, which would render his presence of mutual aid to himself and such owners; but, to the contrary, all the evidence shows that his presence on the premises and in the bath house was for his own pleasure. "In the absence of some relation which inures to the mutual benefit of the owner of the premises and the injured person, or to the former alone, there is no implied invitation. Kirby Lumber Co. v. Gresham (Tex. Civ. App.) 151 S. W. 847; Bennett v. Railway Co., 102 U. S. 577, 26 L. Ed. 235; Kruse v. Railway Co. (Tex. Civ. App.) 253 S. W. 623; Benson v. Traction Co., 77 Md. 535, 26 A. 973, 20 L. R. A. 714, 39 Am. St. Rep. 436; Plummer v. Dill, 156 Mass. 426, 31 N. E. 128, 32 Am. St. Rep. 463. In the case of Bennett v. Railway Co., the Supreme Court of the United States, speaking through Mr. Justice Harlan, says:

"It is sometimes difficult to determine whether the circumstances make a case of invitation, in the technical sense of that word, as used in a large number of adjudged cases, or only a case of mere license. 'The principle,' says Mr. Campbell, in his treatise on Negligence, 'appears to be that invitation is inferred where there is a common interest or mutual advantage, while license is inferred where the object is the mere pleasure or benefit of the person using it.'"

[4] Since we find that all the evidence shows that deceased was upon appellee's premises at the time of his injury for his own pleasure, in no way connected with appellee's business we hold, for the purpose of disposing of the question now being discussed, that he was required to take the premises as he found them; appellee being under no duty to make it safe for his use. Kruse v. Railway Co. (Tex. Civ. App.) 253 S. W. 623; Kirby Lumber Co. v. Gresham (Tex. Civ. App.) 151 S. W. 847; City of Greenville v. Pitts, 102 Tex. 3, 107 S. W. 50; 14 L. R. A. (N. S.) 979, 132 Am. St. Rep. 843; Sage's Adm'r v. Creech, 194 Ky. 415, 240 S. W. 42; Roe v. St. Louis Independent Packing Co., 203 Mo. App. 11, 217 S. W. 335. The case of City of Greenville v. Pitts was one in which the plaintiff was injured by coming in contact with an uninsulated wire wholly on premises used by the city for furnishing the city with electric lights. In that case it was said by Judge Williams, for our Supreme Court:

"Plaintiff was invested with none of the legal rights which pertained to the ownership of the building or an interest therein. He went upon it for purposes of his own and not in the interest of the owner. If he was not a trespasser, he certainly was no more than a licensee under an implied license. If he be regarded as such a licensee, this would not clothe him with any legal right in the use of the building. It would merely relieve him of any imputation of being an unauthorized trespasser. Though his act be regarded as lawful, or even praiseworthy, he nevertheless was using the premises of another for purposes of his own, without any legal right in himself which entitled him to object to the condition in which the owners maintained them."

In the Sage Case it is said:

"Convinced that defendant's duty to decedent, if any, cannot be measured by the attractive nuisance doctrine, it must depend upon whether he was technically an invitee, a licensee, or a trespasser. That he was not an 'invitee,' as that term is ordinarily employed, is clear, since he was on defendant's premises for purposes of his own, and not for any purpose connected with the company's business or beneficial to it. He was therefore either a trespasser or a licensee, and, if the latter, he was a bare licensee since under the facts alleged it is patent he did not have an irrevocable license or interest in the walkway.

* * * The licensee, like the trespasser, must take the premises as he finds them."

In Roe v. Packing Co., 203 Mo. App. 11, 217 S. W. 335, it was held that a licensee, visiting the premises of another, must take the premises as he finds them, with the concomitant perils, and subject to the risk of pitfalls or incidental obstructions; the owners being liable only for hidden traps put out to injure him, or willful, illegal force.

[5] After careful examination of the statement of facts and the law applicable to such facts, we have reached the conclusion that the deceased was, if not a trespasser, a mere licensee; that the owner of the premises was under no obligation to anticipate that the deceased would be injured by reason of an explosion caused by the unauthorized use of the bath house appliances by him, or to warn him of a possible danger of the use of such appliances. Under such circumstances, we conclude that the court did not err in instructing a verdict for appellee, and having so concluded, the judgment is affirmed.

Affirmed.